IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DERROL DEE KIRBY, III                                    PLAINTIFF

v.                           Civil No.  06-2168

JOHN ROTH, Ex-Chief of Police, Barling, Arkansas
Police Department; LARRY MERRILL[1], next in charge
under Police Chief, Barling Police Department;
CITY OF BARLING; KEVIN DOUGAN,
Barling Police Department Patrolman; JOHN
BARBOR, Barling Police Department Patrolman          DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

Derroll Dee Kirby, III (Plaintiff) filed this *pro se* civil rights action under 42 U.S.C. § 1983

in the Eastern District of Arkansas.  It was transferred to this district on September 21, 2006.  Order,

ECF No.  5.  Plaintiff's Complaint was filed *in forma pauperis* (IFP).  Order, ECF No.  6.  This case

was dismissed for failure to prosecute on August 27, 2008.  Order, ECF No.  34.  However, the case

was reopened on July 17, 2009.  Order, ECF.  No.  36.

The case proceeded to a bench trial before the undersigned on April 15, 2010.  Min., ECF

No.  71.  The matter is now before the undersigned on consent of the parties.  Consent, ECF No.  16.

**I.  Background and Witnesses Presented**

Plaintiff in this case presents two civil rights violation claims - one that excessive force was

used against him, and two, that he was denied medical care.  Both claims stem from a traffic stop

made on November 8, 2005.

---

[1] At trial, Defendants moved to amend Defendant Larry Merchant's name to Defendant Larry Merrill.
The motion was granted, and the Clerk of Court is directed to amend the name of record for this defendant.

At the bench trial testimony was presented from the following witnesses in the following order: (1) Derrol Dee Kirby, III, (2) Carol Sue Shoenfeld, (3) Christine Johnson, (4) Kevin Hixon, (5) Danielle Ingram, (6) Rick Cagle, (7) Kevin Dougan, (8) John Barbor, (9) Larry Merrill, (10) John Roth, and (11) Ed Anderson.

In addition to the testimony of witnesses, the following exhibits were also admitted. Plaintiff submitted exhibits numbered one through nine. All were admitted in evidence, with the exception of exhibit nine, which was identified but not admitted as it was a newspaper article. Defendants admitted exhibits numbered one through four into evidence. The Court also made the medical records of Dr. Smith, concerning his treatment of Plaintiff, part of the record.

The Court also notes as a threshold matter that Plaintiff stated his claim was against the Defendants in their official capacities only, however, due to the broad pleading standard applied to pro se cases, and the nature of the evidence presented at the evidentiary hearing by both the Plaintiff and Defendants, the Court will construe Plaintiff's complaint as stating claims against the Defendants in both their official and individual capacities.

Below is a summary of the testimony presented by each witness:

A. Plaintiff Derrol Dee Kirby

On November 8, 2005, a Tuesday, the Plaintiff was pulled over in a routine traffic stop at about 4:00 in the afternoon in Barling, Arkansas. Plaintiff indicated all the reports from the officers gave a different reason for why the stop was made. Kevin Dougan ("Dougan") pulled the car over, and Danielle Ingram ("Ingram"), Plaintiff's girlfriend, was driving the vehicle. Ingram only had a certificate, not a drivers license as the license had not yet been issued. Ingram was initially handcuffed and placed in a police car. Later, Ingram was moved to a second police car. Plaintiff indicated the

placement of Ingram in the second car was to obstruct her view of the subsequent events.

Plaintiff was taken out of the car in which he was a passenger and interrogated about drinking. Plaintiff informed the officers he had Beall's Palsy and was somewhat paralyzed. John Barbor ("Barbor") had arrived on the scene approximately three to five minutes after Dougan had pulled over Ingram and Plaintiff. Barbor told Plaintiff he "didn't like [Plaintiff's] type" and that Plaintiff made Barbor "sick." Plaintiff believed he was being harassed in an attempt to make Plaintiff react or "blow up" at the officers.

Larry Merrill ("Merrill") arrived on the scene and administered six field sobriety tests and then a Breathalyzer test to Plaintiff. Plaintiff was not legally intoxicated as the test registered a .04. Plaintiff and the officers then decided that Plaintiff's mother could come and get him instead of him driving home. Merrill called Plaintiff's mother, Sue Schoenfeld ("Schoenfeld").

Schoenfeld arrived on the scene about 55 minutes after the stop began. When Plaintiff saw his mother arrive, he walked to her. Merrill also asked Plaintiff for consent to a pat down search, but Plaintiff did not give consent, but began walking to Schoenfeld. Plaintiff was told to stop, but he did not obey the command. He took two steps and two officers shot him with a Taser gun simultaneously. Plaintiff felt "on fire" and did not get up off the ground. He had no warning of the Taser's use, and thought it was a real gun. Plaintiff then saw water in a ditch and tried to get in the water.

Barbor kicked Plaintiff approximately three times, and Plaintiff fell on the ground face first. Plaintiff attempted to hide his face with his hands, but he had no muscle control due to the Taser. Roth choked Plaintiff and Plaintiff used his head to push against Roth's chest to break free. The officers were using batons when they hit him.

For two months afterward, Plaintiff was barely able to place his arms on his recliner and he had knots on his shins, due to the force employed by the officers. Plaintiff went to the doctor, but was unable to bathe himself for six months after the incident. His shoulder was also injured because once handcuffed, he was jerked from the ditch to the car and slammed against it, causing injury to his rotator cuff. For six months following the incident, Plaintiff also had difficult getting out of bed on his own. He was unable to sleep or get into a comfortable position.

When the EMT services arrived at the scene, Roth "ran them off," stating the officers could handle the situation and Dougan commented that the Plaintiff was "gonna die." Barbor drove Plaintiff to the detention center and said officers would look over Plaintiff at the detention center. At the detention center, Plaintiff asked to go to a hospital and for a doctor from several officers, but was denied. Plaintiff was placed in the "drunk tank" before his paperwork was finished, and inmates were beating the door to seek help for Plaintiff.

On November 29, 2005, Plaintiff saw Dr. Baker who followed-up with Plaintiff regarding his anxiety disorder. Plaintiff also was seen at the Emergency Room the day after he was incarcerated and received medication for pain. Dr. Smith at River Valley had diagnosed Plaintiff with the anxiety disorder. Plaintiff's medical history also shows that he has been a heavy drinker. Dr. Smith suggested surgery for shoulder, stated some injury could be preexisting, but rotator cuff issues may have been result of the incident with officers. The pain medications Tramdaol and Propo-N/Apap, as reflected in Plaintiff's exhibit two, are the only medications prescribed to Plaintiff which are related to the incident.

During the arrest, methamphetamine was found in Ingram's purse. The officers also recovered a substance from the ditch that was alleged to be methamphetamine. Plaintiff was arrested

for possession of methamphetamine.[2]  Plaintiff never went before a judge or made any appearance on any charges related to the arrest.  Ingram's charges were nol prosed after Ingram's Motion to Suppress was granted by Judge Fitzhugh.

### B.  Sue Schoenfeld

Schoenfeld is Plaintiff's mother.  On the afternoon of the incident, she arrived back in town after a motorcycle ride.  She received two calls from Merrill; the first call was friendly and in the second call Merrill was agitated.  The first was a call came at about 4:00 p.m. stating her son was not drunk, but that he was no able to drive, and asked if Schoenfeld would come and get him and drive the car home.  In the second call Merrill stated there was no need to come and get Plaintiff because he was going to jail.

Plaintiff was on the ground with injuries to his face when Schoenfeld arrived at the scene of the incident.  She arrived approximately thirty to thirty five minutes after the first call with Merrill. There were four police cars and four officers on the scene at that time.  No police officers were in the vehicle, and she did not know if the doors to the police cars were open or closed.

Roth told Schoenfeld there would be no medical attention and that she should "back off."  She was told Plaintiff would be in Sebastian County Detention Center and she could get him in about one hour.  When she arrived at the Detention Center at approximately 7:30 p.m. she was told he would not yet be released and had to come back.  When Plaintiff was released, she took him to the hospital.

Schoenfeld did not remember any information regarding fines, but she did help Plaintiff find

---

[2]  There was some recollection that Plaintiff may have been arraigned before the undersigned on the methamphetamine charges, however the undersigned had no recollection of Plaintiff or the facts of his case.  The case was disposed of by the Honorable Judge Michael Fitzhugh, Sebastian County Circuit Court Division V. Defendants were given the opportunity to move for recusal of the undersigned at the hearing, and waived any such motion.

an attorney.  She contacted Ron Fields, an attorney, on behalf of her son and helped pay the attorney's fee.

C.  Christine Johnson

Christine Johnson ("Johnson") is a registered nurse (R.N.), and was a paramedic with Fort Smith EMS at the time of the incident.  She worked out of St.  Edwards Hospital in Fort Smith. Johnson remembered the call and it was her partner's call.

However, as a paramedic, Johnson does not clear people in the field, and therefore she would advise anyone in Plaintiff's situation that he or she should go to the hospital, because she could not give the clearance the officers were seeking.  Johnson made it clear she was unable to give this clearance due to the restrictions on her, not due in anyway to Plaintiff's condition or anything specific or related to him or the incident at hand.

Plaintiff was somewhat subdued when Johnson encountered him.  Johnson did not remember medical attention being necessary and could not remember if Plaintiff was handcuffed when she saw him.  She did remember that Plaintiff had to be helped off the ground.  She also did not remember Schoenfeld being on the scene.

D.  Kevin Hixon

Kevin Hixon was also a paramedic who arrived to the scene on November 5, 2008.  He remembered being called to the location and seeing several EMS or first responders.  Hixon did not believe that Plaintiff needed to ride to the hospital in the ambulance.

Consistent with Johnson, Hixon stated the EMS did not clear anyone in the field.  Hixon did not check any blood pressure or vital signs.  It is the police department that makes the determination if someone should go to the hospital or not.

-6-

If Hixon had arrived and felt treatment was needed due to the poor condition of the putative patient, he would stress the need for treatment.  Hixon did not feel that was the case at this incident.

E.  Danielle Ingram

Danielle Ingram was driving the car when she was pulled over by Officer Dougan.  She had her certificate, which was not physically with her at the time, and she was driving on a suspended license.  Additionally, the car had no tags.  She was placed in handcuffs behind the car she was driving and then placed in a police car.

Mostly, Ingram stated she could only see what was taking place with Plaintiff, she could hear very little.  The other officers arrived quickly on to the scene and were there in a matter of minutes.  Officer Barbor asked if she or Plaintiff had been drinking and she told him they had not been drinking, and she also informed Barbor of Plaintiff's medical issues.

Ingram observed the field sobriety tests administered by Merrill.  Plaintiff was given the straight line test, touch nose test, and horizontal eye performance, but no one leg stand.

Ingram saw Merrill and Barbor point guns, but she did not know if these were Taser guns.  She could see Plaintiff going up and back down as all three officers beat Plaintiff.  Barbor was on Plaintiff's left, Merrill was at Plaintiff's head, and Dougan was on the right.  Ingram saw Barbor kick Plaintiff one or twice and she saw Roth put Plaintiff in a "headlock."  Plaintiff fell face-first to the ground when he was tased, and he was walking away from the officers; she saw him tased two times.  The first Taser was when Plaintiff was approximately three feet from the officers.  Plaintiff was in-between the car Ingram had been driving and the police car.  Plaintiff was moving toward the road when the Taser was fired.  Once tased, Plaintiff turned around and went to the ditch line.  No officer moved toward Plaintiff, but when he got up he was tased a second time.  When Plaintiff fell the

-7-

second time, the officers swarmed him.  All three officers hit him with their batons and he suffered gashes on his wrists from the placement of the handcuffs.

Ingram also heard Dougan state it was "too bad" they did not have the cameras on to catch Plaintiff on film.

Ingram took the pictures of Plaintiff's injuries submitted as Plaintiff's exhibits 3-8.  Plaintiff also had fluid on his legs and could not place his arms on chairs for several months after the incident. Plaintiff could not bathe or clean himself and so she assisted Plaintiff.  He also was unable to attend his cattle and other livestock.

Paul Hughes was the attorney who represented Ingram in the state charges related to the incident.  She went to Greenwood for court and was assessed a $75.00 fine.  The methamphetamine in her purse was suppressed as evidence, and the rest of the charges then nole prosed.  She did not give any permission or consent to search the vehicle, but she did not know the exact grounds for the suppression of the evidence.

F.  Rick Cagle

Rick Cagle ("Cagle") was one of the first people to see Plaintiff when Plaintiff returned home after the incident.  When Cagle saw Plaintiff the day after the incident, Plaintiff was bruised "from head to toe."

Cagle was at Plaintiff's house to inform Plaintiff that more hay was needed for Plaintiff's cattle.  Plaintiff ran about twenty-two head of cattle at Cagle's property, but Plaintiff was not able to operate a tractor or take care of the livestock for months after the incident.  Cagle saw Plaintiff almost everyday and Plaintiff could not move his shoulder for a long time.

G.  Kevin Dougan

Dougan is a certified law enforcement officer, who was certified as part time at the time of the incident.  Dougan stated he pulled Ingram and Plaintiff over because the car ran a stop sign and had no tags.  There was no camera on his car because there was none available on the Barling Police force at that time.

Ingram was taken to Barbor's car and placed inside.  Dougan asked for Merrill to arrive because Dougan could not give the field sobriety test.  The test was given to determine if Plaintiff could drive the car since Ingram, the original driver, was arrested.  Dougan stated that Plaintiff was acting in a nervous and evasive manner.  Plaintiff would not look at Dougan, was moving around, and gave evasive answers to Dougan's questions.  Plaintiff denied consent to search the car at first, but Merrill was then able to obtain consent.  There was no consent form provided to Plaintiff and no written consent was given. The officers did not ask Ingram for consent to search because Plaintiff indicated the vehicle was his and a Bill of Sale was produced, evidencing his ownership of the car. In the car was a purse containing three straws with foil and white residue.

The officers also wanted to search Plaintiff.  Plaintiff refused consent to a pat-down.  Dougan stated Plaintiff and the officers had been at the stop for approximately thirty to forty minutes and there was no fear of officer safety at that point.  Dougan stated Plaintiff was "resisting" and then Barbour deployed the Taser on the Plaintiff.   Merrill warned Plaintiff to "comply or be tased." Barbour shot prongs out of the Taser, which hit the Plaintiff in his back.   Plaintiff fell down immediately was approximately ten feet away from Barbour when tased.  At the time he was tased, Plaintiff was attempting to leave the scene via the shoulder of the road.  After being tased, the officers attempted to cuff Plaintiff, who then tried to roll on the ground.  Plaintiff was on the ground with his

hands in front of him, and the officers attempted to get his hands so they could place him in handcuffs. Dougan remembered no strikes or attempts to subdue Plaintiff. There were no strikes given for him to submit to handcuffs. Plaintiff was continually fighting the officers. After refusing to submit, Plaintiff attempted to roll away and ended up in the ditch.

Plaintiff was in water in the ditch the second time he was tased. The second Taser was a drive stun, delivered by the Taser gun without the prongs being deployed, but placing the Taser directly on the Plaintiff's body. At some point while in the ditch, Plaintiff kicked off his boots, and drugs were later found in that area, believed to have been concealed in the boot. Plaintiff and the officers scuffled until Plaintiff was placed in handcuffs by four officers. Dougan denied pulling up Plaintiff by his handcuffs, and stated it was not proper procedure to do so.

The Taser policy is to call the first responder and have the victim of the Taser evaluated and that policy was followed in this incident.

H.  John Barbor

Barbor denied making any statements to Plaintiff when he arrived on the scene. Rather, he walked up with a clipboard and documents to get consent to search. There was no reason Plaintiff did not sign the consent form, but Plaintiff gave verbal consent as long as the officers "did not tear up" Plaintiff's car. Barbor also felt the search was valid because the consent to search would have included consent to the purse and it was a search incident to arrest.

Dougan was running Ingram's license through NCIC, and he advised Barbor that the license was suspended. Additionally, alcohol was detected, so the officers had to be certain Plaintiff was able to drive the car if Ingram was taken to the detention center. Barbor believed Plaintiff was intoxicated, but not too intoxicated to drive.

-10-

Barbor asked for consent for a search, but Plaintiff refused to consent. Barbor remembered Plaintiff trying to kick off his boots, Barbor thought Plaintiff had a weapon concealed in his boot.

Plaintiff was in a running stance when Taser was deployed, and a five second burst was given. Plaintiff was still resisting, so a second deployment of the Taser was made, through the same barbs already embedded in the Plaintiff. There was no effect to the second burst. Plaintiff was able to get up, he slung off all three officers and all three attempted to grab him again. All the officers and Plaintiff then were in the ditch.

The Barling policy regarding the Taser use is to deploy in circumstances of noncompliance before wrestling or fighting with a suspect.

The first responders evaluated Plaintiff, but the EMS did not evaluate. Barbor stated he was not certain who made the decision regarding whether Plaintiff should go to the hospital. Plaintiff suffered abrasions to the face; was tased twice, once with barb projectiles, and once by drive stun method; and rolled down a hill to a ditch. The only baton strike was to Plaintiff's leg, and the only cuts and scrapes to face were from where Plaintiff fell after being tased and from the rocks on the ground during the scuffle.

I.  Larry Merrill

Merrill remembered Plaintiff giving consent to search the vehicle. In his report, Merrill stated Plaintiff was under the influence alcohol. Merrill testified it could have been the influence of methamphetamine. Merrill administered the sobriety tests and found that Plaintiff failed to follow directions in each test. Merrill did not score any of the sobriety tests he performed on Plaintiff, as he was judging reactions to the tests and Plaintiff's behavior. Merrill stated it was his practice not to score sobriety tests he administered. Although Plaintiff was not over the legal limit, he was under the

-11-

influence.  Additionally, the breathalyzer/PBT testing device used by the Barling Police Department was not accurate at the time of the incident.  The report did not include the information regarding calling Plaintiff's mother, as that was done as a courtesy.

Plaintiff gave consent to search the car once he was told he could revoke the consent at any time.  Prior to consent, Plaintiff was exhibiting nervous behaviors such as walking back when the officer would come toward him, fidgeting, and pacing.  Merrill stated the officers wanted to search the car due to information Plaintiff had a prior arrest for marijuana possession combined with the nervous behaviors Plaintiff was currently exhibiting.  When asked if there were any weapons in the car Plaintiff replied he did not "think so."  Plaintiff was passive until the pat down search, and then he became combative with the officers.

Plaintiff had at least two, and possibly three warnings about the use of a Taser if he did not get out of traffic and off the road.  At this point, Plaintiff was backing up on to the highway.  When Plaintiff tried to run, he was tased and went face-first onto the pavement of the road.  Hand-to-hand interaction with the officers is more dangerous to officer safety, thus the Taser was utilized first.

The first responders were asked by Merrill to come to the scene and the EMS was dispatched because of the first responder dispatch.  The Taser policy required the officers to have Plaintiff checked before transporting him.  Plaintiff was given oxygen for a period of time.  Plaintiff never asked to go to hospital, and due to the scuffle, all the officers and the Plaintiff were harmed with cuts and abrasions.  Plaintiff indicated he was hurting, but did not mention his shoulder.  There was no reason to keep Plaintiff from the hospital, but his injuries were not significant enough to send him there.

-12-

J.  John Roth

At the time of the incident, John Roth was the Chief of the Barling Police Department.  The Taser policy was that if the Taser was used, the person tased must be checked out by medical professionals.  The first responders are paid to stay at the station on a twenty-four hour a day basis, seven days a week.  If a call comes in where the first responders have to leave the station, then volunteers come in.  Some of these responders are paid, some are not.

Generally, medical expenses of arrestees or inmates are paid from the general fund.  The city does not try to inhibit doctor visits.  First responder reports are oral statements given to the officers and then the inmates are evaluated again at booking into the detention center.

Roth saw no kicking or striking with batons, but he did see Barbor perform the last leg strike.

Plaintiff was charged on May 16, 2006 with resisting arrest.  No charges were ever filed in circuit court on resisting arrest, only after Plaintiff pled guilty to the other charges did they filed the misdemeanor.

K.  Ed Anderson

Ed Anderson ("Anderson") was a first responder who was called to the scene of the incident. Generally, Anderson is called out when the EMT is called.  Bryan Wyndell performed the initial assessment.  However, Anderson arrived when Plaintiff was handcuffed and on the ground, and Plaintiff never stated he wanted to go to the hospital.

According to Wyndell's report, Plaintiff had chest pain and breathing issues, was alert and oriented with a "good" talking vocabulary.  Plaintiff clearly was not having a heart attack or cardiac issues because the sharp pain and pain radiation associated with those events was not present. Plaintiff's lungs were "clear and equal" and he had no abdominal pain.  Plaintiff's pulse oxygen levels

were 97%, which is a good rating.  Plaintiff also exhibited two puncture wounds, presumably related to the Taser barbs.

Anderson stated if he thought someone should go to the hospital, he would tell the police and it was normal routine for him to be called out on these types of calls.

## II.  Discussion

### A.  Excessive Force

The Plaintiff claims excessive force was used on him when a Taser was deployed.  A Court must analyze excessive force claims in the context of seizures under the Fourth Amendment, applying its reasonableness standard.  *Henderson v.  Munn*, 439 F.3d 497, 502 (8th Cir.  2006).  The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances."  *Henderson*, 439 F.3d at 502 (quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) and *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994)) (internal quotations omitted).

The Court will evaluate the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  This calculus allows "for the fact that police officers are often forced to make split-second decisions-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."  *Id.* at 397.  The reasonableness inquiry, however, is an objective one: "the question is whether the officers' actions are 'objectively reasonable'

-14-

in light of the facts and circumstances confronting them." *Id.*

Reasonableness of the officer's conduct includes consideration of the following three circumstances: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see also Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009). The Court will address each factor in turn, below.

In the case at bar, it is difficult to determine the severity of the crime at issue regarding Plaintiff, because at the time force was used against him, the officers testified Plaintiff had committed no crime and was not under arrest. The facts established that suspected methamphetamine had been found in a bag belonging to Ingram, who was detained in a police car. There was no evidence the suspected drugs were related to Plaintiff in any way, nor was there any evidence the officers were attempting to arrest Plaintiff for any connection to those suspected drugs. Therefore Plaintiff's crime was not severe – it was nonexistent.

Plaintiff did admit he was asked to stop when he turned away from the officers, but that he did not comply. In fact, Dougan testified that Merrill had ordered Plaintiff to "comply or be tased." The officers indicated Plaintiff was told to stop on more than one occasion. At most the evidence established that the severity of Plaintiff's conduct was the failure to comply with a command of an officer. While this may be a crime, Defendants offered no proof of any such crime or its severity, and Plaintiff was never charged with any such crime.

Likewise as to the second consideration – Plaintiff did not present a danger to the safety of officers or others. First, the officers plainly stated in their testimony that they had no fear of the Plaintiff, specifically Dougan testified he was not afraid, and as the officer who initiated the stop he

had the longest contact with Plaintiff.

This leads the Court to another important consideration, the length of time during which the Defendants and Plaintiff were in contact along the side of the road. The officers testified they wanted to pat-down Plaintiff for weapons, but the facts clearly established that Plaintiff had been out of the car among the officers for thirty to thirty-five minutes before any pat-down was attempted. During this time the officers found the suspected drugs linked to Ingram, learned of Plaintiff's prior criminal history of marijuana possession, and had asked if there were weapons in the car, to which Plaintiff stated he did not "think so."

There was no follow up or further indication that Plaintiff may have possessed a weapon on his person. The car had been also been searched with no weapons found. Officers also indicated that Plaintiff was acting evasive and nervous and had exhibited problems in passing the six sobriety tests which were administered to him. However, the officers testified they were seeking to search the car and Plaintiff in order to be "proactive" as they waited for Plaintiff's mother to arrive at the scene. No evidence was submitted to show the attempted search was based on probable cause or reasonable suspicion.

Additionally, the Court also finds notable the number of officers at the scene. Four officers were available at the scene, and Ingram was handcuffed in the back of a parol car, not being monitored. Clearly, Plaintiff alone was not a reasonable threat to four officers.

There was further evidence presented that Plaintiff was next to a roadway, but the evidence also showed he was attempting to run up the shoulder of the road, not into the road itself. Therefore, there is little, if any, evidence of a safety threat to others. No evidence was submitted of how many, if any, cars were on the roadway, or if the cars were having to operate in an unsafe manner to avoid

Plaintiff.

Finally, the Court must consider whether Plaintiff was resisting arrest or attempting to evade arrest by flight.  As noted above, there is no evidence the officers were attempting to arrest Plaintiff when the Taser was deployed.  The evidence showed that Plaintiff was asked to consent to a "pat-down" search at the time he began backing away and appeared to be leaving the scene.  Therefore, Plaintiff by backing away or beginning to leave was not evading or resisting an arrest at that point, because there was no evidence of a crime or other basis for any arrest of Plaintiff to be made. Moreover, although there was testimony that Plaintiff was asked to stop, there was no evidence he was told he was being placed under arrest; as stated above, Plaintiff was only told to "comply or be tased."   In fact, it is difficult to determine what Plaintiff would be arrested for because, until that point, Plaintiff had been generally cooperative with the officers.

Thus, the issue is whether in light of these circumstances: no pending arrest and no threat to officer safety, whether the Taser was objectively reasonable force to respond to Plaintiff's failure to consent to a pat-down search as requested by the officers and his attempts to leave the scene.  The Court also notes the facts of this case do not present the type of "tense, uncertain, [or] rapidly evolving" circumstances calling for "split-second decisions" about the amount of force necessary to subdue or restrain a suspect. *See Brown*, 574 F.3d at 496 (internal quotation marks omitted)

Many cases reviewing the use of a Taser and excessive force have weighed the factors as set forth above, generally finding that compliance by the subject and lack of resistance or fleeing to weigh against the reasonableness of the Taser.  *See, e.g., Parker v. Gerrish*, 547 F.3d 1, 8-11 (1st Cir. 2008) (upholding jury verdict that officer used excessive force in Tasering an arrestee who had insulted the officers but also had complied with their requests and did not resist arrest); *Zivojinovich v. Barner*,

-17-

525 F.3d 1059, 1071-73 (11th Cir. 2008) (per curiam) (use of a Taser to subdue a suspect who had repeatedly ignored police instructions and continued to act belligerently found to be reasonably proportionate to the need for force); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-87 (10th Cir. 2007) (use of a Taser and related force against a nonviolent misdemeanant who did not flee or actively resist arrest found to be excessive); *Draper*, 369 F.3d at 1277-78; *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992) (genuine issue of material fact raised as to whether the use of a Taser on a potentially homicidal and suicidal individual who was holding a knife in each hand and had made threatening statements to police officers constituted excessive force).

For example, in *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009), a police officer stopped a car along a highway. *Id.* at 494. The male driver began to exit the vehicle, but the officer ordered him to get back in the car. The driver complied. Three officers approached the driver's window, asked if he knew why he had been stopped, and when he replied that he did not, opened the door, pulled him out, threw him against the side of the vehicle, and handcuffed him. Meanwhile, the driver's wife sat quietly in the passenger's seat. She became frightened by the officers' behavior, so she called 911 on her cell phone. During her conversation with a 911 operator, an officer "yanked open" her door and yelled, "Get off the phone." The woman replied that she was frightened and wanted to stay on the phone with the 911 operator. The officer again ordered her to get off of the phone, to which she replied again that she was frightened. Without another word, the officer applied the prongs of his Taser to the woman's upper right arm, grabbed her phone and some of her hair, and threw the phone out of the driver's side door onto the shoulder of the road. The officer grabbed her right arm and pulled her out of the car, bending her arm behind her back. A second officer bent her left arm behind her back, and the officers escorted her to a police car, lifting her up by her arms along

the way.  She was then handcuffed and placed inside the car. Upon those facts, the Eighth Circuit was

not convinced that the officer's use of force was objectively reasonable as a matter of law. *Id.* at

494-96.  The court reasoned that the woman's conduct did not amount to a severe or violent crime

because she was merely suspected of an open bottle violation for some empty glasses in her seat. *Id.*

at 496.  The court further reasoned that the woman posed a minimal safety threat to the officers and

was not actively resisting arrest or attempting to flee. *Id.* at 497.

The *Graham* factors demonstrate that where a suspect has committed such a minor crime that

a reasonable officer would not even issue a citation, and where the suspect poses only a remote and

theoretical threat to officer safety, and where the officers have not attempted to handcuff the suspect

or otherwise execute an arrest, it is objectively unreasonable to deploy a Taser to subdue the suspect.

*See Orsak v.  Metropolitan Airports Com'n Airport Police Dept.*, 675 F.  Supp.  2d 944 (D.  Minn.

2009); cf. *Cook*, 582 F.3d at 859 (Shepherd, J., concurring in part and dissenting in part) ("'[A]

reasonable officer would not discharge his Taser simply because of insolence.' " (*quoting Parker v.*

*Gerrish*, 547 F.3d 1, 10 (1st Cir. 2008))); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th

Cir. 2007) (concluding that none of the Graham factors supported the deployment of a Taser and

noting that "[t]he absence of any warning-or of facts making clear that no warning was

necessary-makes the circumstances of this case especially troubling," because the officer gave the

plaintiff "no opportunity to comply with her wishes before firing her Taser"); *Michaels v. City of*

*Vermillion*, 539 F. Supp.2d 975, 990 (N.D. Ohio 2008) ("[T]he use of a Taser ..., although nonlethal,

may be excessive if it is gratuitous.").

In assessing the reasonableness of the use of force, the "court may also consider the result

of the force" and "the extent of the suspect's injuries." *Smith*, 586 F.3d at 580-81; *Rohrbough*, 586

F.3d at 585-86 (internal quotation marks omitted). This analysis is relevant in light of the court's duty to balance the governmental interests at stake, as addressed by the *Graham* factors, against the nature and quality of the intrusion on the individual's interests. *See Howard*, 570 F.3d at 989. Where, as here, the governmental interests are clearly minimal, even a comparatively modest intrusion may violate the Constitution.

Tasers are generally considered non-lethal or less lethal force." *Sanders v. City of Fresno*, 551 F.Supp.2d 1149, 1168 (E.D. Cal. 2008) (collecting cases). The Eighth Circuit has rejected efforts "to minimize the pain of being shot with a stun gun" as "completely baseless," noting that "a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless." *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir.1993). The court described the effects of such force as "torment without marks." *Id.* Other courts have also recognized that the effects of the Taser are more than de minimis. In *Lewis v. Downey*, the Seventh Circuit rejected a magistrate judge's determination that "the use of the Taser gun was a de minimis application of force." 581 F.3d at 475; *see also Orem v. Rephann*, 523 F.3d 442, 447-48 (4th Cir. 2008) (affirming the district court's rejection of defendant's argument that a 1.5 second application of a Taser in drive stun mode resulted in only de minimis injury). In the Fourth Amendment context, the Western District of Washington acknowledged that "the use of a Taser constitute[s] significant force." *Beaver*, 507 F.Supp.2d at 1144.

Even if a Taser does not require hospitalization or cause quantifiable injuries, it does cause extreme pain, and such pain may support a claim for excessive force. In examining excessive force claims brought under the Eighth Amendment, courts examine the extent of the pain, rather than the extent of the injury. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Eighth Circuit has noted that

"extreme pain can be inflicted with little or no injury." *Hickey*, 12 F.3d at 757. Just as it would be unacceptable to "permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury," *McMillian*, 503 U.S. at 9, it would also be unacceptable to permit arresting officers to use any degree of force, no matter how painful or intrusive, so long as it did not inflict some arbitrary quantity of injury.

The technology of Tasers does not grant law enforcement officials license to cause extreme pain when the governmental interests at stake are minimal. In such circumstances, the use of a Taser inflicts gratuitous pain, in violation of the Fourth Amendment, and. *See Buckley*, 292 Fed. Appx. at 802-03 (Martin, J., dissenting) ("[A]t the very least, the Fourth Amendment prohibits the infliction of gratuitous pain and injury as a means to coerce compliance."). Other district courts have observed "it is critical that the use of Tasers be limited to situations in which officer safety is a legitimate concern and other, less painful means of subduing a difficult individual are not available." *Orsak*, 675 F.Supp. 2d at 961.

In this case, the evidence is clear that Plaintiff was not being arrested when the Taser was used on him, and he posed no serious safety threat to the officer or others. Balancing those government interests with the pain inflicted by the Taser on the Plaintiff, the force was unreasonable under the circumstances. *See Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) ("In addition to the circumstances surrounding the use of force, we may also consider the result of the force."); *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ("[E]ven where some force is justified, the amount actually used may be excessive." (quoting *Santos v. Gates*, 287 F.3d 846, 853

(9th Cir. 2002))).[3]

The forgoing analysis concerns the use of the Taser to force compliance with the pat-down search.  Once Plaintiff began fighting the officers, which began at some point after the second burst was administered,[4] the Court can not say the force applied at that point was unreasonable or excessive.  As Barbour was the Defendant who deployed the Taser on the Plaintiff, liability lies with him.  However, the remaining Defendants - Roth, Merrill, and Dougan, could be liable for failing to intervene in the use of excessive force.

 In the context of a Section 1983 claim alleging a police officer's failure to intervene, the Eighth Circuit in *Nance v.  Sammis*, 583 F.3d 604, 612 (8th Cir.  2009) adopted the following test to determine the witnessing officer's liability under the Fourth Amendment:

> A police officer who fails to act to prevent the use of excessive force may still be held liable where (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Nance*, 583 F.3d at 612 (*quoting Floyd v.  City of Detroit*, 518 F.3d 398, 406 (6th Cir.  2008)). From the evidence presented at trial, all the officers were present and close to Barbour when Barbour fired his Taser.  Any of the officers could have stopped Barbour, because as observed above, this was not a scenario requiring fast-paced, split-second reasoning.  Rather, after thirty-five to forty-five

---

[3]  Defendants, in their Answer, ECF No.  14, ¶ 16, state they are entitled to the defense of qualified immunity.  However, no evidence or argument regarding qualified immunity was presented to the Court during the evidentiary hearing.  Thus, the Court will not reach the issue in this Order.  Qualified immunity is an affirmative defense, so defendants have the burden of pleading and proving the defense. *Harris v. Pirch*, 677 F.2d 681, 686 (8th Cir.1982).  *See e.g.*, *U.S. ex rel. Tyrrell v. Speaker*, 535 F.2d 823 (3d Cir. 1976) (where the court affirmed a judgment for plaintiff against the defendant warden and observed that the warden apparently introduced no evidence on qualified immunity at all).

[4]  No officer testified that they ever told Plaintiff to remain on the ground, but the Taser was redeployed when Plaintiff attempted to stand.

minutes of being on the side of the road with Plaintiff, Barbor pulled his Taser, Merrill and Dougan warned Plaintiff about the use of the Taser, and no one sought to prevent Plaintiff from having to "comply or be Tased" regarding a pat down search for which the officers testified they had no safety concerns, but were rather being "proactive."

The only basis submitted by Plaintiff for compensation for the excessive force is a four-page medical expenses summary from the Wal-Mart Pharmacy. Pltf. Ex. 2. Plaintiff stated at the hearing the only medications listed on that document relating to his injuries are Tramadol and Propo-N/Apap. The total Plaintiff paid for these medications according to the medical expense summary is $167.42. While Plaintiff submitted some medical records, and the Court subpoenaed medical records on Plaintiff's behalf, Plaintiff did not submit any medical bills beyond the medication summary. Accordingly, the Court finds Plaintiff should be awarded $167.42 in damages for excessive force against Defendants Barbor, Roth, Merrill, and Dougan in their individual capacities.

B.  City of Barling's Taser Policy

Plaintiff has sued the Defendants in their official capacity.  Official capacity claims are tantamount to suing the municipality itself.  A municipality can be liable under Section 1983 if a plaintiff can prove that it has adopted some policy, custom, or practice, that caused a violation of the Plaintiff's Federal constitutional rights. *See, Lund v. Hennepin County*, 427 F.3d 1123, 1125 (8th Cir.2005); *City of Canton v. Harris*, 489 U.S. 378, 386-87, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see also, Angarita v. St. Louis County*, 981 F.2d 1537, 1546 (8th Cir.1992)( "A municipality may be held liable under Section 1983 only if a municipal custom or policy caused the deprivation of [a] right protected by the constitution or federal laws."); *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218, 223 (8th Cir.1994)("[M]unicipal governments can be held liable for the acts of their

-23-

employees in contravention of the civil rights of individuals only upon a showing that a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' is the motivating force behind the acts of those employees"), *quoting Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978).

At trial, the Defendants stated the Taser policy was to use the Taser before hand-to-hand interaction with subjects.  The use of a Taser on the use of force continuum was likened to that of pepper or OC spray.  No written Taser policy was submitted by the Defendants, nor was it clear if a written policy existed.  Rather, the Defendants' relied upon their own testimony regarding the existence and nature of the policy.  However, there was no question among the Defendants that this was the policy, in whatever form, and that the City was aware of the policy.

It is clear the policy of utilizing a Taser before utilizing other available force, such as physical contact with the subject, allowed the Taser to be deployed to force compliance with the pat-down search.  In other words, the connection between the policy and the constitutionally-impermissible harm is clear.  Such a policy would also allow a Taser to be used on an otherwise cooperative subject or one that was "passively resisting."  Policies which have allowed such Taser use have been questioned.  *See Oliver v. City of Orlando*, 2008 WL 4000863 (M.D. Fla.  2008).  Thus, the Court finds the policy which places the use of a Taser so low on the force continuum it is deployed before conventional physical contact is not permissible as currently stated, and can lead to excessive force being used.

Therefore, Defendants should provide to the Court proposed revised policies regarding the Taser and the use of force policy for the City of Barling on or before December 15, 2010.

-24-

C.  Denial of Medical Care

Plaintiff has alleged that he was denied medical care after the Taser was used on him by the officers, and when he was detained at the Sebastian County Detention Center.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (citation omitted). In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.' " *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care,

-25-

deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir.1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97,(1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

Regarding Plaintiff's claim he was not given adequate medical care following the use of a Taser to his person, there is simply no evidence to show deliberate indifference on behalf of the Defendants. The undisputed evidence was that an EMT was called to the scene, evaluated Plaintiff and provided him oxygen. The EMT did not suggest that Plaintiff go to the hospital or receive other medical treatment beyond what was provided "in the field." Neither the EMT/paramedics nor the officers remembered Plaintiff asking to go to the hospital. Therefore there is no evidence to suggest, much less establish, that Plaintiff had an objectively serious medical need and the Defendants knew of but disregarded that need.

Moreover, regarding his claims that at the detention center other inmates attempted to get

-26-

medical attention for Plaintiff, but those efforts were ignored, Plaintiff provided no evidence beyond his own testimony to establish those claims. No inmate testified they had requested this help for Plaintiff, and no Defendant testified they heard or knew of the need for help. Evidence was presented that Plaintiff went to the emergency room after he was released from the detention center. However, he was not admitted to the hospital, but was prescribed pain relief medication. Therefore, there is no evidence Plaintiff was suffering an objectively serious medical need that Defendants were aware of, but disregarded, during his detention in the Sebastian County Detention Center.

## III. Conclusion

For the reasons stated above, the Court finds Plaintiff is entitled to judgment in his favor on his excessive force claim against Defendants Barbour, Roth, Merrill, and Dougan, including damages of $167.42.[5]

It is further ordered that, no later than December 15, 2010, Defendants file proposed revised policies regarding the use of Tasers and the continuum of force.

Finally, judgment is entered in favor of the Defendants regarding Plaintiff's claim of denial of medical care.

**IT IS SO ORDERED** this **9th day of November 2010.**

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

---

[5] Plaintiff did retain counsel at one point in this case, but he did not provide any information regarding any legal fees he had paid, therefore no attorney's fees are awarded.

-27-