IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


DERROL DEE KIRBY, III                                                    PLAINTIFF

v.                                        Civil No.  06-2168

JOHN ROTH, Ex-Chief of Police, Barling, Arkansas
Police Department; LARRY MERRILL[1], next in charge
under Police Chief, Barling Police Department;
CITY OF BARLING; KEVIN DOUGAN,
Barling Police Department Patrolman; JOHN
BARBOR, Barling Police Department Patrolman        DEFENDANTS

MEMORANDUM OPINION AND ORDER

        Derroll Dee Kirby, III (Plaintiff) filed this *pro se* civil rights action under 42 U.S.C. § 1983

in the Eastern District of Arkansas.  It was transferred to this district on September 21, 2006.  Order,

ECF No.  5.  Plaintiff's Complaint was filed *in forma pauperis* (IFP).  Order, ECF No.  6.  This case

was dismissed for failure to prosecute on August 27, 2008.  Order, ECF No.  34.  However, the case

was reopened on July 17, 2009.  Order, ECF. No.  36.  Following a bench trial, a Memorandum

Opinion and Order and separate Judgement were entered in this case on November 9, 2010.  ECF

Nos.  72, 73.

        The matter is now before the undersigned on consent of the parties.  Consent, ECF No.  16.

By mandate of the United States Court of Appeals for the Eighth Circuit, ECF No.  84, this case has

been remanded back to the undersigned to determine in the first instance whether to award damages

for pain and suffering or punitive damages.  *Id.*  To this end, a supplemental bench trial on the issues

_____

        [1] At trial, Defendants moved to amend Defendant Larry Merchant's name to Defendant Larry Merrill.  The
motion was granted, and the Clerk of Court is directed to amend the name of record for this defendant.

of damages for pain and suffering and punitive damages was held on October 6, 2011.

Plaintiff subsequently filed a Motion to Reopen Case and Court Proceedings. ECF No. 102. In this motion, Plaintiff states certain policies have been provided to counsel from Defendants, and that if Plaintiff had been aware of the policies he could have stated new claims and new legal theories. Plaintiff requests to be able to reopen the case, the Court assumes for the purpose of raising these new claims; to make the ordinances part of the record; and in the alternative, to be allowed to take a deposition of the Defendants on the issue of the policies for submission to the Court.

The Motion to Reopen the Case, ECF No. 102, is **DENIED**. More than adequate time for discovery has been allowed in this matter. There is no indication these policies, or draft/proposed policies, could not have been requested prior to this late stage of the proceeding. Moreover, this case is before the Court only on the issues of punitive damages and for damages for pain and suffering. This Court requested the materials presented by the Defendants, ECF No. 101, which includes the policies referred to by the Plaintiff. The Court will consider those policies as is appropriate to this matter. No further deposition on that matter is necessary or warranted.

## I.  Background and Witnesses Presented

A bench trial was initially held before the undersigned on April 15, 2010. The evidence presented in that bench trial was recounted in this Court's prior Memorandum Opinion and Order, and will not be included herein. *See* ECF No. 72.

At the supplemental bench trial regarding damages, testimony was presented from the following witnesses in the following order: (1) Derrol Dee Kirby, III, (2) Danielle Ingram, (3) Shirley Ingram, (4) Rick Cagle, (5) John Roth, (6) John Miller, (7) Kevin Dougan, (8) Larry Merrill and (9) John Barbor.

-2-

In addition to the testimony of witnesses, the following exhibits were also admitted:  Plaintiff submitted exhibits numbered one through six.

Below is a summary of the testimony presented by each witness:

A.  Plaintiff Derrol Dee Kirby

Plaintiff testified that when he attempted to leave the scene of a traffic stop, the details of which are recounted in the prior Order of this Court, ECF No.  72, he was shot by two officers simultaneously with Taser guns.  According to Plaintiff, there were four wires attached to him from the Taser guns.  The result of being tased in this matter led to excruciating pain and a loss of muscle control.  Plaintiff went to the ground head-first, to an asphalt surface, when he was stunned by the Taser guns.  He had no muscle control to submit his hands for handcuffs, as was requested by the officers.  Plaintiff testified he was tased again, and a physical altercation followed, before he was placed in handcuffs.  Plaintiff could not identify which officer was the one who placed him in handcuffs.  The physical altercation involved Plaintiff and the officers rolling down a small hill, and some of the altercation continued in a ditch at the bottom of that hill.

While in the ditch, Plaintiff was agin tased by two stun guns being placed on his stomach, while Defendant Roth choked him.  Plaintiff testified he knew Defendants Barber and Merrill each had tased him, at least on one occasion.

Upon being escorted back up the hill, Defendant Dougan carried Plaintiff up the hill and jerked Plaintiff three times from the ditch to the side of the road and eventually slammed Plaintiff into the tire of a police car.

Plaintiff testified that if he had been asked to stop from leaving the scene, he would have stopped, but such a command was never given.  Plaintiff also testified that the traffic stop was

"peaceful" until the Taser deployment.  Plaintiff did agree that he had refused to consent to a pat-down search, prior to being tased.  After the incident, Plaintiff testified was unable to take care of his cattle and his self and suffered considerable pain.  Specifically, Plaintiff had difficulty sleeping and was uncomfortable in any position for several days due to bruising on his body.

### B.  Danielle Ingram

Danielle Ingram is Plaintiff's girlfriend, and was present at the incident at issue.  Ingram was placed under arrest before the altercation with Plaintiff began, and she was physically placed in Defendant Dougan's police car, allowing her a view of the entire scene.

Ingram agreed that Barbor and Merrill both used Taser guns on Plaintiff, causing him to fall flat on his face.  Once the Taser guns were deployed, the officers did nothing, while Plaintiff remained on the ground for several seconds.  Plaintiff got up and began to pull the Taser barbs out from where they had hit him.  Ingram stated the officers were in no hurry, and had more than enough time to cuff Plaintiff after the first Taser deployment, but did not do so.

During the next altercation, Plaintiff went to the ground a second time, and attempted to get away from the officers.  Ingram saw Merrill tase Plaintiff again.  Plaintiff then went to the ditch, which was down a small hill from where the altercation began.  Defendant Dougan brought Plaintiff back up the hill, and was pulling him up the hill with a jerking motion.  Ingram testified the driver's side door was open and she could hear Dougan tell Plaintiff it was "too bad" the cameras, which were mounted in the police car, were not on.  Ingram believed this comment was made to note that the officers were acting inappropriately and they knew their actions were not recorded.

### C.  Shirley Ingram

Shirley Ingram is Danielle Ingram's mother, and saw Plaintiff within a few days of the

incident.  She testified that Plaintiff could not move his arms, was helpless, and that Danielle Ingram had to put her full attention to assisting and taking care of Plaintiff because he was unable to care for himself due to his injuries.  Shirley Ingram testified it was months after the incident before Plaintiff could care for himself.

Plaintiff was unable to pick up his infant child, was sore when he moved, but could raise his arms, although he had difficulty even raising his arms to place them on an arm-chair.  Shirley Ingram also saw facial bruises.  Plaintiff was more able to move freely after a few weeks had passed, but his difficulties as a whole continued for several months.

### D.  Rick Cagle

Rick Cagle is a neighbor to Plaintiff, who saw Plaintiff the same day Plaintiff was released from the Sebastian County Detention Center.  When he came to Plaintiff's home that day, Danielle Ingram was crying and clearly upset as she attempted to assist Plaintiff while he was in the bathroom, trying to get cleaned up upon his return home from the detention center.  Cagle saw "knots" all over Plaintiff's body, red marks, and could tell Plaintiff was in considerable pain.

Cagle assisted Plaintiff in feeding Plaintiff's cattle for four months, and saw Plaintiff at least once a week during this time, as Plaintiff was not physically able to perform this work himself.

### E.  John Roth

John Roth was the Chief of Police for the City of Barling, Arkansas, during the incident in question.  Plaintiff was already tased in the initial incident before Roth arrived on the scene.  Roth believes the actions of his officers were proper.

The Taser used on Plaintiff was a X26 from Taser Industry.  Roth did not know when the Taser was first used, or if it could record uses.  However, it utilized a five-second burst of 50,000

-5-

volts through a cartridge.  Roth testified there were only two cartridges on the scene - one from Barber and one from Merrill, and thus Plaintiff was only possibly shot twice during the incident. Once a cartridge was deployed, it was used up.  The Taser utilized a "barb" system – where, when deployed, barbs would be ejected and would embed themselves in the skin of the target and the voltage would be carried along a wire that connected the barbs to the Taser gun itself.  Another "shot" could be administered if the wires were still attached.  Also, the Taser could be used in a direct contact with the suspect , also called a "drive stun" mode.  Roth testified he did not carry a Taser and was not trained or certified to do so.

Further, Roth testified that a the time he was tased, Plaintiff was going to be placed in the back seat of the patrol car for officer safety, so he would not be out on the street.  Roth also testified there was no written policy in effect for Taser deployment at the time of the incident.  However, the verbal policy was to use the Taser before any hand-to-hand contact with a suspect.  Taser guns had been used before and after this incident.

### F.  John Miller

John Miller was involved in an incident with Defendant Dougan in April of 2010.  Miller is an Army veteran, having served for eight years.  Miller lived in Barling, and on April 16, 2010, Dougan came to his home to inquire about a go-cart which was in Miller's yard.  At the time Dougan arrived, Miller was outside the home on his porch.  Dougan asked Miller to provide identification, and Miller went into the home to retrieve it.  At the time, Miller was also engaged in a phone call. While Miller was retrieving the identification as requested, Dougan slammed the door with his hand and pushed Miller against the wall.  At this time, Miller had a leg brace and also was walking with a cane due to a leg injury.

Dougan then told Miller he was running or fleeing from the police.  Dougan pulled his Taser gun and told Miller to get back into his chair.  Without any warning, orders, or telling Miller he was under arrest, Miller was tased in the back by Dougan.  No handcuffs were placed on Miller at that time, and Dougan re-loaded the Taser and shot Miller two more times.  Miller further testified that while he was in obvious pain, Dougan would smile.

During the altercation, Miller took three steps to his front door, and told the children in his home to go to the back room.  Miller then went to the back door, when Dougan charged in, walked into Miller's living room, and fired his Taser gun, nearly missing a fourteen year old.  Miller was grabbed at the throat, and picked up off ground.  He was shot with the Taser again from the front, and was having seizures as a result of the altercation.  Miller was charged with two counts of battery on an officer and with resisting arrest and fleeing, but all charges were dropped.

G.  Kevin Dougan

Kevin Dougan testified that he was attempting to arrest Plaintiff when he deployed his Taser. Dougan was trained on the use of his Taser, and was trained to use it for both officer safety and for safety of the public.  Dougan testified that officer safety was an issue because Plaintiff was curling his fists and cursing, was intoxicated, and was becoming a danger to himself and others.  At the time, Dougan felt he used necessary force, and there were no written policies in place specific to the use of the Taser.

Dougan also refuted the testimony of John Miller, stating that Miller was attempting to flee, was being disorderly and disruptive to Dougan's investigation at the time of the incident with Miller. Dougan also stated he only used the force necessary on Miller to effect arrest, and that included soft physical strikes to gain control of Miller.

### H.  Larry Merrill

Defendant Merrill is currently with the Paris, Arkansas, police department, but he did work for the Barling, Arkansas police department during the relevant time.  At that time, he carried a Taser and still carries one.  During the incident with the Plaintiff, he carried a Taser X26.  According to Merrill, the Taser X26 can not record with video and leaves no "log" of its use.

Merrill stated he deployed the Taser on Plaintiff during the incident at issue because Plaintiff was being disorderly, refusing commands, refused a pat-down search and was moving toward a busy roadway.  Before deploying the Taser, Merrill intended to arrest Plaintiff for being disorderly, but did not tell Plaintiff that Plaintiff was under arrest at the time.  Merrill estimated that approximately 30-45 minutes elapsed from the initial stop to the pat-down request.

Merrill stated there was no specific written Taser policy at the time of the incident, he was to follow the use of force policy and only use enough force as necessary.  He was trained to use the Taser before physical force was applied, and considered it to be a tool of pain compliance to affect arrest.  According to Merrill's training, a Taser could be used to affect an arrest, once the suspect was fleeing.  If a suspect was disorderly, a Taser could be used, at times, as well.

During the incident in question, Barber deployed the first Taser to Plaintiff's back.  Plaintiff went to the pavement, but continued to resist and fight the officers from the roadway.  Merrill deployed his Taser at the top of the hill, as Plaintiff was moving down the hill to the ditch area.

### I.  John Barbor

Barbor agreed he was the first to use the Taser gun on Plaintiff.  He told the Plaintiff that Plaintiff was under arrest, and when Plaintiff moved into the roadway, he told Plaintiff to come back toward him.  Barbor agreed that at trial, he had not indicated that he believed Plaintiff to be under

arrest at the time the Taser was used.  However, Barbor clarified that he meant Plaintiff was not handcuffed at the time.  Plaintiff was not following a lawful order to get out of the roadway and was resisting the officers.  Barbor believed that Plaintiff was a threat to the safety of the public and himself and could be tased as a result.  Moreover, Plaintiff refused to comply and made verbal and physical gestures of threats to the officers.

Barbor also testified that under the use of force policy in effect at the time, if verbal commands were not complied with, then the Taser could be deployed.  In the instance at hand, Barbor displayed the Taser gun as a show of force and advised Plaintiff several times that he may be Tased if he did not follow commands of the officers.

## II.  Discussion

The Court finds the credible evidence presented at the bench trial to be that Plaintiff suffered pain from the initial use of the Taser guns – the instance found to be excessive in an earlier ruling by this Court.  Plaintiff also suffered a cut to his face, and some facial bruising and other superficial facial injuries from where he fell into the asphalt roadway as a result of the initial Taser incident. However, the Court also finds that the majority of Plaintiff's injuries were incurred when he resisted the police officers after this first incident.  The resistance by Plaintiff to the commands of the officers also is an intervening cause of his injuries, and the Court does not find that all of Plaintiff's injuries were proximately caused by the initial constitutional violation.

With that background, the Court turns to the issue of Plaintiff's damages for pain and suffering.  Compensatory damages under § 1983 are governed by general tort-law compensation theory. *See Carey v. Piphus*, 435 U.S. 247, 255 (1978).  In *Carey*, the Supreme Court noted that damages are available under § 1983 for actions "found . . . to have been violative of . . .

constitutional rights and to have caused compensable injury." *Id.* (internal quotation marks and citations omitted). The law generally provides that damages may be awarded for injuries such as mental anguish and suffering, personal humiliation, and monetary losses. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (citations omitted). However, damages may not be awarded for the abstract or subjective value of the constitutional right at issue. *See Stachura*, 477 U.S. at 308; *Carey*, 435 U.S. at 248.

This Court has already awarded Plaintiff compensatory damages in the form of compensation for the medication he was prescribed for his injuries, which was the entirety of the medical bills presented to the Court for an award of actual damages. When considering the award for pain and suffering, the Court notes that it was only the initial Taser use which was found to be excessive, and therefore this Court should limit any pain and suffering award to those injuries caused by this initial use, and not Plaintiff's injuries as a whole. While it appears Plaintiff suffered more than a *de minimis* injury, he was not severely injured by the initial Taser use, or by the facial injury due to his fall from that Taser use. Therefore, the Court finds the award of $1.00 in nominal damages is appropriate to compensate for Plaintiff's pain and suffering. As this Court has previously found that although it was Defendant Barbor who deployed the Taser on the Plaintiff, the remaining Defendants, with the exception of Roth who was not present at the time of the initial Taser incident, could be liable for failing to intervene in the use of the excessive force. Therefore, Plaintiff is entitled to judgment in his favor on his claim for pain and suffering damages against Defendants Barbor, Merrill and Dougan.

"[F]orce that is excessive within the meaning of the Eighth Amendment is compensable if it causes the prisoner actual injury, even if the injury is not of great significance." *Lawrence v.*

*Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (*quoting Howard v. Barnett*, 21 F.3d 868, 873 (8th Cir. 1994)). The United States Court of Appeals for the Eighth Circuit has held that "[a]n injury warranting nominal damages is not necessarily the result of a *de minimis* use of force. Stated differently, it is possible for a use of force to be excessive and in violation of the Eighth Amendment, and yet result in an injury having no or only nominal monetary value." *Foulk v. Charrier*, 262 F.3d 687, 701 (8th Cir. 2001).

Regarding Plaintiff's claim for punitive damages, under § 1983 punitive damages are only recoverable against city employees sued in their individual capacities. *Wilson v. Maricopa County*, 463 F. Supp. 2d 987 (D. Ariz. 2006). In order to recover punitive damages, a plaintiff must show more than "a bare violation of section 1983." *See Wade v. Haynes*, 663 F.2d 778, 785 (8th Cir.1981). He must also prove that the defendant acted "with actual knowledge that he was violating a right 'secured by the Constitution and laws' or 'with reckless disregard of whether he was . . . violating such a right.'" *Guzman v. Western State Bank*, 540 F.2d 948, 953 (8th Cir. 1976); *see also Walters v. Grossheim*, 990 F.2d 381, 385 (8th Cir. 1993). Punitive damages are never awarded as a matter of right, no matter how egregious the defendant's conduct may have been, and governmental entities are immune from liability for punitive damages under section 1983. *Smith v. Wade*, 461 U.S. 30, 36, 52(1983).

Having given careful consideration to the testimony elicited at the bench trial, I conclude Plaintiff is not entitled to an award of punitive damages. Although I concluded excessive force was used on Plaintiff, I do not believe the evidence elicited shows the conduct was motivated by evil

motive or intent or involved reckless or callous indifference to Plaintiff's federally protected rights.[2] At most, the evidence established that the Defendants, in reacting to Plaintiff's desire to leave the scene and failure to submit to their commands, failed to meet the situation at hand with an appropriate degree of force.

## III.  Conclusion

For the reasons stated above, the Court finds Plaintiff is entitled to judgment in his favor on his claim for pain and suffering damages against Defendants Barbor, Merrill and Dougan, in the amount of nominal damages of $1.00.

Finally, judgment is entered in favor of the Defendants regarding Plaintiff's claim of punitive damages.

**IT IS SO ORDERED** this **27th day of December 2011.**

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE

---

[2]  The Court also finds the testimony of John Miller to be of little relevance to the matter at bar.  The situation with Miller occurred at a time after the incident with Plaintiff, and with Defendant Dougan.  Defendant Barbor, not Defendant Dougan, administered the excessively forceful use of a Taser in the case at bar.  The incident with Mr. Miller also occurred before this Court had ruled that the force used by Defendants against Plaintiff was excessive.  Therefore, there could have been no notice to Officer Dougan, as a result of this case, that any modifications needed to be made to the Taser use or policy.  Moreover, the testimony regarding the incident with Mr. Miller and whether the force used was excessive is still disputed.  The Court makes no ruling or comment as to whether the Taser use in Mr. Miller's incident was an acceptable degree of force, and specifically limits its view of Mr. Miller and Mr. Dougan's testimony on that matter to find only that it is of limited relevance to this case.